# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black;">

*In re James W.*, 2014 IL App (5th) 110495

</div>

| | |
|---|---|
| Appellate Court Caption | *In re* JAMES W. (The People of The State of Illinois, Petitioner-Appellee, v. James W., Respondent-Appellant). |
| District & No. | Fifth District<br>Docket No. 5-11-0495 |
| Filed | May 30, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Respondent was properly ordered to remain subject to involuntary admission and hospitalized in a mental health or developmental center of the Department of Human Services, which is the least restrictive environment currently appropriate and available, since the trial court's error in giving unconstitutional and outdated criteria for involuntary commitment at the hearing on the State's petition to continue respondent's involuntary admission was harmless where the jury returned a general verdict and there was clear and convincing evidence that respondent was unable to care for his basic needs if not subject to involuntary commitment, respondent was not denied effective assistance of counsel, his counsel subjected the State's case to meaningful adversarial testing, and the testimony of a psychiatrist based on respondent's condition at the time of the hearing satisfied the requirements of section 3-807 of the Mental Health and Developmental Disabilities Code. |
| Decision Under Review | Appeal from the Circuit Court of Randolph County, No. 11-MH-126; the Hon. Richard A. Brown, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Veronique Baker and Barbara A. Goeben, both of Guardianship & Advocacy Commission, of Alton, for appellant. |
| | |
| | Jeremy R. Walker, State's Attorney, of Chester (Patrick Delfino, Stephen E. Norris, and Kelly M. Stacey, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| | |
| Panel | JUSTICE STEWART delivered the judgment of the court, with opinion. Justices Goldenhersh and Spomer concurred in the judgment and opinion. |

## OPINION

¶ 1    The respondent, James W., appeals from the trial court's October 13, 2011, order concluding that he should remain subject to involuntary admission and be "hospitalized in a Department of Human Services mental health or developmental center, which is the least restrictive environment currently appropriate and available." We affirm.

¶ 2                              BACKGROUND

¶ 3    On September 15, 2011, a petition was filed in the circuit court of Randolph County seeking to continue the involuntary admission of the respondent in a Department of Human Services mental health center pursuant to section 3-813 of the Mental Health and Developmental Disabilities Code (the Code) (405 ILCS 5/3-813 (West 2010)). Ellen Steibel, a Chester Mental Health Center employee, alleged that the respondent was "a person with mental illness, who because of his or her illness is reasonably expected, unless treated on an inpatient basis, to engage in conduct placing such person or another in physical harm or in reasonable expectation of being physically harmed" and is "a person with mental illness, who because of his or her illness is unable to provide for his or her basic physical need so as to guard himself or herself from serious harm without the assistance of family or others, unless treated on an inpatient basis." The respondent was admitted, on an involuntary basis, to the Chester Mental Health Center on December 13, 2003, from the Dixon Correctional Center. Ms. Steibel alleged that the respondent believed he did not have a mental illness, was not always medication-compliant, exhibited aggression toward staff and peers, and was paranoid with fixed delusions and poor insight and judgment.

¶ 4    Inpatient certificates by Chester Mental Health Center staff psychiatrist Dr. T. Casey and licensed social worker Tracy Mott were filed with the petition. Both opined that the respondent was in immediate need of hospitalization because he was "a person with mental illness who, because of his or her illness is unable to provide for his or her basic physical need so as to guard

himself or herself from serious harm, without the assistance of family or others, unless treated on an inpatient basis."

¶ 5 Dr. Casey outlined the respondent's history. At the time of the report, the respondent was a 57-year-old single black man who had never married. He had an eighth-grade education. Since 1986 he had multiple Department of Human Services admissions. He had been convicted and incarcerated in the Department of Corrections for robbery, attempted murder, aggravated battery, aggravated sexual assault, possession of an illicit substance, and parole violation. He was readmitted to the Chester Mental Health Center in December 2003 as an involuntary admission from the Dixon Correction Center after reaching his mandatory parole date. The respondent had been diagnosed with chronic paranoid schizophrenia and had been treated with various antipsychotic medications.

¶ 6 Dr. Casey wrote that he examined the respondent on September 7, 2011. Dr. Casey reported that the respondent was psychotic, paranoid, and periodically aggressive, engaged in sexually inappropriate behavior, and possessed poor insight and judgment. He noted that the respondent was preoccupied and delusional about having syphilis. He complained about painful urination and blood in his urine, and he demanded penicillin shots despite negative tests. Dr. Casey wrote that the respondent did not believe he has a mental illness and had problems with medication compliance, resulting in an increase in positive symptoms of psychosis. Dr. Casey noted that while the respondent's last restraint was in January 2011, he continued to be verbally abusive and periodically physically aggressive. Dr. Casey opined that the respondent continued to need the structure and supervision provided in a secure setting because without it he was unlikely to comply with his medications and treatment, causing him to further decompensate and inflict physical harm upon others.

¶ 7 Ms. Mott examined the respondent on September 6, 2011. In her inpatient certificate, she noted that the respondent's psychiatric history dated back to age 13. She wrote that he suffered from both paranoid and grandiose delusions. He believed that he was "Jesus Christ Superstar" and other important religious figures. He also had a fixed delusional belief that he had a constant urinary tract infection and needed daily doses of antibiotics, despite repeated negative laboratory tests. Ms. Mott reported that since May 2011, the respondent had refused to take his medication on 19 occasions and, on May 31, 2011, told his therapist that he will not take his psychiatric medications when he is released. She noted that he consistently presented with antisocial behaviors such as stealing from his peers, harassing his peers, and having no regard for the welfare of others. Ms. Mott opined that the respondent was in need of involuntary hospitalization because he lacked insight into his mental illness, he demonstrated an impaired capacity for reality testing, and he was unable to understand his need for treatment. She believed that because of the length of time that the respondent had been hospitalized and incarcerated, he would be unable to provide for his basic needs without extensive support in the community.

¶ 8 A treatment plan that was formulated on August 16, 2011, was attached to the petition. It was signed by Dr. Casey and Wayne Womac, the respondent's coordinating psychologist. Three problems were identified: psychiatric symptoms, verbal and physical aggression, and inappropriate sexual behavior. The respondent was diagnosed with chronic paranoid-type

- 3 -

schizophrenia and an antisocial disorder. In the treatment plan it was noted that the respondent continued to be delusional. In particular, the respondent believed he had an undetected infection, that he was a central figure in the Old Testament, that he had "visions of light in the sky" that communicate with him, and that he was being singled out for persecution. His delusions and paranoid ideations caused him to become violent or to defend himself with aggression and/or illegal behaviors. It was noted that while the respondent had not been as aggressive as in the past, he continued to harass his peers. According to his treatment team, the respondent was not compliant with medications and therapeutic interventions.

¶ 9 The respondent filed a motion for an independent evaluation. On September 26, 2011, the trial court granted his motion and appointed Dr. Nageswara Vallabhaneni to conduct the independent evaluation.

¶ 10 On October 12, 2011, a jury trial was held. The inpatient certificates and the treatment plan were not admitted into evidence. Dr. Vallabhaneni testified that he is a psychiatrist who works at Chester Mental Health Center as an independent contractor. He stated that he had been a board-certified psychiatrist for 31 years. He met with the respondent on September 29, 2011, and October 4, 2011. The respondent did not cooperate with the full evaluation and their contacts were very brief. Dr. Vallabhaneni explained the purpose of the evaluation to the respondent. Each time the respondent said, "Oh, I want to go home. I want discharged." and walked away.

¶ 11 Dr. Vallabhaneni testified that he had performed evaluations on the respondent on May 18, 2010, February 8, 2011, and March 31, 2011. In forming his opinion Dr. Vallabhaneni testified that he based it on a review of the respondent's clinical file, his own observations of the respondent, his past contact with the respondent, the treatment plan, Dr. Casey's records, and the most recent psychiatric evaluation done at Chester Mental Health Center. Dr. Vallabhaneni diagnosed the respondent with paranoid-type schizophrenia and antisocial personality disorder. He stated that the respondent is delusional and believes he suffers from syphilis despite medical evidence to the contrary. The respondent persists in the belief, claims to have symptoms, and is so disturbed by the delusion that he cannot stop asking for treatment for the ailment.

¶ 12 Dr. Vallabhaneni testified that he believed that the respondent is a person who, because of his mental illness, can act out in a dangerous manner hurting himself or others. He stated that the respondent has a long history of assaulting other patients as evidenced by his behavior, aggression, and placement in restraints. Dr. Vallabhaneni stated that in the respondent's last treatment plan it was reported that the respondent was involved in an aggressive act with another patient on September 4, 2011. The respondent had been harassing the peer, and when the peer became aggressive, the respondent fought with him.

¶ 13 Dr. Vallabhaneni opined that because the respondent is schizophrenic he is not likely to take his medication if released from Chester Mental Health Center. He stated that often schizophrenics do not take their medications because they believe that there is nothing wrong with them and fear that medicine will harm them. Dr. Vallabhaneni testified that if the respondent failed to take his medication he would have an immediate acute relapse. His symptoms would return very quickly, he would become psychotic, and he would be unlikely to

take care of his own basic physical needs. Patients with serious mental illness who go off medication believe they do not need to bathe, eat properly, or sleep properly. Dr. Vallabhaneni anticipated that if released from Chester Mental Health Center, the respondent would neglect his basic needs in every way, possibly to the point where someone would realize he had a problem and take him back to a mental health facility. Dr. Vallabhaneni testified that the respondent's failure to take his medication would cause the respondent's symptoms to return, his condition would be worse, and the mental deterioration would cause him to be more likely to engage in dangerous conduct.

¶ 14    Dr. Vallabhaneni opined that the respondent had not reached the mental/behavior stability required to be transferred or discharged. Dr. Vallabhaneni felt that, due to the respondent's serious mental disorder, the current placement in Chester Mental Health Center was clinically justifiable and that he was an appropriate candidate for involuntary commitment to a mental health facility within the Department of Human Services.

¶ 15    The respondent testified on his own behalf. When asked why he felt he should be released from the Department of Human Services he replied: "Because I served my time. I got a better life than being incarcerated." He testified that if released he planned to go to Chicago, where he felt he would be able to find employment in the construction field. He planned to live in a group home until he could find his own apartment. He stated that his family lives in Detroit, California, and Iowa, but he would not consider living with any of them. The respondent testified that if released he would take his medication as prescribed. When asked if he believed that he suffered from a mental illness he replied, "Slightly." He testified that he would not be a danger to himself or others.

¶ 16    The following instruction was given to the jury:

"A person is subject to involuntary admission when he is

A person with mental illness and who because of his illness is reasonably expected to engage in dangerous conduct which may include threatening behavior or conduct that places that person or another individual in reasonable expectation of being harmed;

A person with mental illness and who because of his illness is unable to provide for his basic physical needs so as to guard himself from serious harm without assistance of family or outside help; or

A person with mental illness who, because of the nature of his illness, is unable to understand his need for treatment and who, if not treated, is reasonably expected to suffer or continue to suffer mental deterioration or emotional deterioration, or both, to the point that the person is reasonably expected to engage in dangerous conduct.

If you find from your consideration of all the evidence that any one of these propositions has been proven by clear and convincing evidence, you should find the respondent subject to involuntary admission.

If you find from your consideration of all the evidence that none of these propositions has been proven by clear and convincing evidence, you should find the respondent not subject to involuntary admission."

¶ 17    The jury found that the respondent was subject to involuntary admission. The verdict form was a general verdict form that stated simply, "We the jury, find the Respondent, James W *** , subject to involuntary admission." On October 13, 2011, the trial court ordered the respondent to be hospitalized in a Department of Human Services mental health or development center, which is the least restrictive environment currently appropriate or available. The respondent filed a timely notice of appeal.

¶ 18                                          ANALYSIS

¶ 19    At the trial, the jury was instructed regarding three alternative criteria necessary to find the respondent subject to involuntary commitment. Two of these criteria were based on outdated statutory language from section 1-119 of the Code (405 ILCS 5/1-119 (West 2008)). The first and third criteria involved "dangerous conduct," a statutory standard found unconstitutional in *In re Torski C.*, 395 Ill. App. 3d 1010, 1027, 918 N.E.2d 1218, 1232-33 (2009). Subsequent to *In re Torski C.*, the legislature amended section 1-119 (Pub. Act 96-1399, § 5 (eff. July 29, 2010) (amending 405 ILCS 5/1-119 (West 2008))) to remove any references to "dangerous conduct" and changed the commitment criteria under section 1-119. The second criterion presented to the jury is still valid under the amended statute, which provides that a person is subject to involuntary admission on an inpatient basis if he or she is "[a] person with mental illness who because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or others, unless treated on an inpatient basis." 405 ILCS 5/1-119(2) (West 2010). The respondent argues that because the trial court instructed the jury on unconstitutional and outdated criteria for involuntary commitment, he was denied his right to a fair trial.

¶ 20    The respondent brings this appeal from an involuntary admission order that was to remain in effect for 180 days from the date of the order. Because that time has expired, the order is no longer in effect and no actual relief can be granted. Before we can address the merits of the respondent's appeal, we must first determine whether any exception to the mootness doctrine applies. Whether an appeal is moot presents a question of law and is reviewed *de novo*. *In re Karen E.*, 407 Ill. App. 3d 800, 804, 952 N.E.2d 45, 50 (2011). There are three exceptions to the mootness doctrine in cases of involuntary admission: (1) the collateral-consequences exception, (2) the public-interest exception, and (3) the capable-of-repetition-yet-avoiding-review exception. *In re Charles K.*, 405 Ill. App. 3d 1152, 1161, 943 N.E.2d 1, 8 (2010). Whether a case falls within one of the exceptions must be examined on a case-by-case basis. *Id.*

¶ 21    The issue in the instant case involves whether giving the jury instructions based on a statute that has been ruled unconstitutional and has been amended to remove the unconstitutional language deprives the respondent of a fair trial. The public-interest exception to the mootness doctrine applies. "The public interest exception allows a court to consider an otherwise moot case when (1) the question presented is of a public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *In re Alfred H.H.*, 233 Ill. 2d 345, 355, 910 N.E.2d 74, 80 (2009). The procedures and statutory guidelines that must be followed to order

the involuntary commitment of an individual to a mental health facility are matters of considerable public concern. *In re Lance H.*, 402 Ill. App. 3d 382, 385-86, 931 N.E.2d 734, 738 (2010). Thus, the issue in this case is of a public nature.

¶ 22 Next we must examine whether there is a need for an authoritative determination and if there is a likelihood of future recurrence of the question. The State tendered the jury instructions, and defense counsel stated he had no objection to the instructions. The trial court accepted the instructions without question. In entering the order for the involuntary treatment of the respondent, the trial court used a preprinted form. The form had a box to check if the person was subject to involuntary admission and three boxes to check for the criteria for finding the respondent subject to involuntary commitment. The trial court did not check any of the criteria. The three criteria on the preprinted form included two containing the language "dangerous conduct." This language was found to be unconstitutional in *In re Torski C.*, 395 Ill. App. 3d at 1027, 918 N.E.2d at 1232-33. In 2010 the legislature amended the statute to eliminate the "dangerous conduct" language. This became effective July 29, 2010. The order in this case was entered on October 13, 2011, two years after the decision in *In re Torski C.*, and more than one year after the legislature amended the statute. We believe there is a need for an authoritative determination for future guidance, and we feel there is a likelihood of future recurrence of the issue. Thus, we find that the issues in this case related to the use of a jury instruction containing unconstitutional language satisfy the public-interest exception to the mootness doctrine, and we will consider the respondent's argument.

¶ 23 In the instant case, the respondent did not raise an issue in the trial court concerning the propriety of the jury instructions. A respondent forfeits review of a jury-instruction error if he did not object to the instruction or offer an alternative instruction. *In re Charles K.*, 405 Ill. App. 3d at 1163, 943 N.E.2d at 10. At issue is whether the respondent received a fair trial. The imposition of involuntary mental health services implicates an individual's substantial liberty interests. *In re Charles H.*, 409 Ill. App. 3d 1047, 1054, 950 N.E.2d 710, 716 (2011). Forfeiture is a limitation on the parties, but not the court. *Id.* at 1055, 950 N.E.2d at 716. A finding that respondent has forfeited his constitutional argument could result in this court affirming his involuntary commitment even though the commitment might have been based on an unconstitutional statutory standard. Because a substantial liberty interest is involved and forfeiture is not a limitation on the court, we choose to address the issue raised in this appeal.

¶ 24 The respondent argues that because the trial court instructed the jury on unconstitutional and outdated criteria for involuntary commitment, he was denied his right to a fair trial. The respondent raises no issue with the jury instruction concerning his ability to provide for his basic needs.

¶ 25 "Instructions convey the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict." *People v. Mohr*, 228 Ill. 2d 53, 65, 885 N.E.2d 1019, 1025 (2008). Jury instructions that are not supported by the law should not be given. *Id.* at 65, 885 N.E.2d at 1026. The reviewing court must determine whether the instructions, considered together, fully and fairly announce the law applicable to the theories of both parties. *Id.* "Although the giving of jury instructions is generally reviewed for an abuse of discretion, when the question is whether the jury instructions accurately conveyed to the jury

the law applicable to the case, our review is *de novo*." *People v. Pierce*, 226 Ill. 2d 470, 475, 877 N.E.2d 408, 410 (2007).

¶ 26　　In *In re Charles K.*, a jury found the respondent to be a person subject to involuntary admission. *In re Charles K.*, 405 Ill. App. 3d at 1154, 943 N.E.2d at 3. On appeal, the respondent argued that the order of commitment should be reversed because the jury was not instructed that the State was required to prove by clear and convincing evidence that he was mentally ill. *Id*. at 1154-55, 943 N.E.2d at 3. The respondent admitted he did not object to the instruction at trial or offer an alternative instruction. *Id*. at 1163, 943 N.E.2d at 10. The court found that the issue presented was of sufficient importance to justify its review despite the respondent's forfeiture of the issue. *Id*. The respondent urged the court to review the issue under a doctrine analogous to the plain-error doctrine. *Id*. The court noted that while the plain-error doctrine applies to criminal and not civil cases, a similar analysis should be applied. *Id*. The court found that in reviewing the matter it must first determine whether any error occurred, and if so, whether the respondent suffered prejudice from the error. *Id*. at 1164, 943 N.E.2d at 10.

¶ 27　　The court found that the instructions given to the jury did not explicitly convey that the State had the burden of proving by clear and convincing evidence that the respondent suffered from a mental illness. *Id*. at 1165-66, 943 N.E.2d at 12. It held that because the instructions did not make clear a necessary element of the State's burden of proof, it was error not to include an instruction explicitly conveying each and every factor that the State was required to prove in order to support a finding that the respondent was a person subject to involuntary admission. *Id*. at 1166, 943 N.E.2d at 12. The court then examined whether the respondent was prejudiced by the error. It held that a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed. *Id*. The court found that, given the weight of the evidence presented at trial that respondent suffered from a mental illness, the fact that the jury was not specifically instructed about the State's burden of proof was harmless error. *Id*. at 1167, 943 N.E.2d at 13. It found that the result of the trial would not have been any different had the jury been properly instructed. *Id*.

¶ 28　　In the instant case, the trial court erred in giving instructions based on statutory provisions that had been found unconstitutional and had been amended to remove any reference to "dangerous conduct." We must examine whether the respondent was prejudiced by the error. Section 6-100 of the Code provides that "[j]udicial proceedings conducted pursuant to this Act shall be conducted in accordance with the Civil Practice Law, except to the extent the provisions of this Act indicate to the contrary or are inconsistent, in which case this Act governs." 405 ILCS 5/6-100 (West 2010). Section 2-1201 of the Code of Civil Procedure provides, in pertinent part, that "[i]f several grounds of recovery are pleaded in support of the same claim, whether in the same or different counts, an entire verdict rendered for that claim shall not be set aside or reversed for the reason that any ground is defective, if one or more of the grounds is sufficient to sustain the verdict." 735 ILCS 5/2-1201(d) (West 2010).

¶ 29　　In the instant case, Ms. Steibel filed a petition for involuntary admission on the grounds that the respondent was a person with a mental illness who because of his illness was reasonably expected, unless treated on an inpatient basis, to engage in conduct placing him or

- 8 -

another in physical harm or in a reasonable expectation of being physically harmed and is unable to provide for his basic physical needs so as to guard himself from serious harm without the assistance of family or others, unless treated on an inpatient basis. The grounds for involuntary admission pled in the petition were in accordance with section 1-119 of the Code (405 ILCS 5/1-119 (West 2010)). The jury instructions included three grounds for the involuntary admission of the respondent. Two of those grounds were based on parts of section 1-119 that were declared unconstitutional and violative of the substantive guarantees of due process. The jury returned a general verdict that the respondent was subject to involuntary admission. While two of the grounds presented in the jury instructions were based on a statute ruled unconstitutional, the second ground presented in the jury instruction was a valid ground. Because the jury returned a general verdict and one of the theories presented was a valid ground for involuntary admission, the verdict will be upheld if there was sufficient evidence to sustain the theory.

¶ 30    The respondent argues that the State failed to prove by clear and convincing evidence that he met the one valid criteria presented to the jury for involuntary commitment. At a commitment hearing, the State's burden is to prove by clear and convincing evidence that the respondent is a person subject to involuntary admission. *In re Nau*, 153 Ill. 2d 406, 427, 607 N.E.2d 134, 144 (1992). "The clear and convincing standard requires proof greater than a preponderance, but not quite approaching the criminal standard of beyond a reasonable doubt." *In re D.T.*, 212 Ill. 2d 347, 362, 818 N.E.2d 1214, 1226 (2004). A reviewing court may not disturb a jury's decision unless it is against the manifest weight of the evidence. *Burgess v. Abex Corp.*, 311 Ill. App. 3d 900, 903, 725 N.E.2d 792, 795 (2000). A jury's decision is given respect and deference, and a reviewing court will not invade the function of the jury and substitute its judgment for the jury's. *Hawkes v. Casino Queen, Inc.*, 336 Ill. App. 3d 994, 1011, 785 N.E.2d 507, 520 (2003). A judgment is against the manifest weight of the evidence only when an opposite conclusion is clearly apparent or where the jury findings are unreasonable, arbitrary, or not based on evidence. *Id.* at 1010, 785 N.E.2d at 520.

¶ 31    In the instant case, the jury was instructed that if it found, from consideration of all the evidence, that the State proved by clear and convincing evidence that the respondent was a person with mental illness who because of his illness was unable to provide for his basic physical needs so as to guard himself from serious harm without assistance of family or outside help, it should find the respondent subject to involuntary admission. This instruction accurately reflected the law. Section 1-119 provides, in pertinent part, that a person is subject to involuntary commitment if the State shows he or she is:

> "(2) A person with mental illness who because of his or her illness is unable to provide for his or her basic physical needs so as to guard himself or herself from serious harm without the assistance of family or others, unless treated on an inpatient basis[.]" 405 ILCS 5/1-119(2) (West 2010).

¶ 32    The respondent argues that there was no evidence of any recent observation of him to support Dr. Vallabhaneni's opinion that he was unable to take care of his basic needs. The respondent asserts that Dr. Vallabhaneni was not his treating physician or a member of his treatment team, and had only two brief contacts with him. The respondent argues that based on

the doctor's lack of direct, current interaction with him and the lack of direct evidence regarding his ability to meet his basic needs, the evidence was not sufficient for the jury to find him subject to involuntary commitment.

¶ 33    Section 3-807 of the Code provides, in pertinent part, that "[n]o respondent may be found subject to involuntary admission on an inpatient or outpatient basis unless at least one psychiatrist, clinical social worker, clinical psychologist, or qualified examiner who has examined the respondent testifies in person at the hearing." 405 ILCS 5/3-807 (West 2012). This court has held that section 3-807 "requires the examiner to attempt a personal interview but that if the respondent refuses or is intentionally uncooperative, then the statutory examination may be based on discussions with treating staff and a review of medical records." *In re David B.*, 367 Ill. App. 3d 1058, 1069, 857 N.E.2d 755, 764 (2006).

¶ 34    The respondent requested an independent medical evaluation, and the court granted his motion. Dr. Vallabhaneni was appointed to evaluate the respondent. Dr. Vallabhaneni had not treated the respondent since 2004, but was familiar with him. He attempted to interview the respondent on September 29, 2011, and October 4, 2011. The respondent refused to cooperate, stated that he wanted to be discharged, and then walked away. Because the respondent was intentionally uncooperative with the physician performing the independent medical evaluation that he requested, Dr. Vallabhaneni could base his examination on a review of the medical records and discussions with treating staff.

¶ 35    Dr. Vallabhaneni testified that in addition to his meeting with the respondent on September 29, 2011, and October 4, 2011, he had performed evaluations of the respondent on May 18, 2010, February 8, 2011, and March 31, 2011. He stated that he formed his medical diagnosis of the respondent based on his extensive history, his clinical record, and his brief meetings with the respondent. Dr. Vallabhaneni particularly relied on the information from Dr. Casey, the respondent's treating psychiatrist, plus his treatment plan review conducted on September 13, 2011. Because the respondent was uncooperative with Dr. Vallabhaneni, and Dr. Vallabhaneni based his testimony on his meetings with the respondent and a review of the respondent's medical records, his testimony met the requirements of section 3-807 of the Code.

¶ 36    The respondent argues that the State failed to show by clear and convincing evidence that he was unable to care for himself if released. "Generally, the inability to care for oneself so as to guard against physical harm is found where one's illness substantially impairs [his] thought processes, perceptions, emotional stability, behavior, or ability to cope with life's ordinary demands." *In re Tuman*, 268 Ill. App. 3d 106, 112, 644 N.E.2d 56, 60 (1994). "In making such a determination, a court should consider whether a person (1) can obtain [his] own food, shelter, or necessary medical care; (2) has a place to live or a family to assist him; (3) is able to function in society; and (4) has an understanding of money or a concern for it as a means of sustenance." *Id.*

¶ 37    Dr. Vallabhaneni testified that the respondent suffered from schizophrenia, paranoid type, and from antisocial personality disorder. He testified that the respondent's schizophrenia caused him to have thought disturbances and that he often believed people were against him. Dr. Vallabhaneni testified that the respondent was delusional and had a strong belief that he suffered from syphilis. The respondent believed he had symptoms and demanded treatment

- 10 -

with penicillin. Despite evidence to the contrary, the respondent could not be convinced he did not have syphilis. Dr. Vallabhaneni testified that the respondent's delusion was so strong that he could not stop asking for treatment for the condition.

¶ 38    Dr. Vallabhaneni testified that the respondent had no insight into his mental illness. When asked if he believed he was suffering from a mental illness, the respondent replied, "Slightly." When asked on direct examination why he felt he should be released from the Department of Human Services, the respondent replied: "Because I served my time. I got a better life than being incarcerated. You know, I had skills. I do construction work. I have–I have been working since I was 13." From this response, the jury could find that the respondent did not understand that he was in Chester Mental Health Center for treatment of mental illness and that this bolstered Dr. Vallabhaneni's testimony that the respondent had little insight into his mental illness.

¶ 39    Dr. Vallabhaneni testified that he and the respondent's treating physician and treating psychologist all felt that the respondent was mentally ill and met the criteria for involuntary commitment. Dr. Vallabhaneni stated that the respondent was delusional and aggressive. Dr. Vallabhaneni testified that based on the respondent's lack of insight into his mental illness, his history of noncompliance in taking medication, and his diagnosis, there was a very good possibility that he would not take his medication if released from Chester Mental Health Center. He stated that if the respondent failed to take his medication it would result in an immediate acute relapse. The respondent's symptoms would return and his condition would be worse. Dr. Vallabhaneni stated that if the respondent relapsed, he would be unlikely to take care of his own basic physical needs.

¶ 40    "The jury as trier of fact is in a superior position to a reviewing court to determine the witness' credibility and weigh the evidence." *Ryan v. Mobil Oil Corp.*, 157 Ill. App. 3d 1069, 1076, 510 N.E.2d 1162, 1166 (1987). The respondent responded to questions in an odd and inappropriate manner. The respondent testified that he had resided at Chester Mental Health Center for eight years. He stated that a facility up north transferred him to Chester Mental Health Center because: "The facility up north, they evaluated me. They said I don't have a place to stay, you know, and so they put me in a hospital, but I came with $10,000 in my pocket." When the respondent was asked if he had been committed to a different institution he replied:

> "No, just the county. I was–I would be arrested for things that wasn't true, you know. First of all, in 1975, I was arrested for armed robbery, and in front of Judge James M. Bailey, he denied me a fair trial, and I got found guilty and he give me six to 20. I did the six years, I get out, police drive up on me, and they put me in the car. They accused me of being such and such and so I committed murder out of Michigan or I'm on parole. And each time they picked me up I'm doing six years, eight years, four years, three years, over 37 years–"

The respondent was asked if he had ever been transferred from Chester before and he responded:

> "I was going–coming back and forth to Chester from being picked up in Chicago by officers, and they would give me an evaluation, and I would come back and forth from

- 11 -

> Chester to the county so many times. And like Vallabhaneni said, you know, we go back a ways, all the way to '78 sometime when I first met him."

From these responses the jury could determine that the respondent had been in the mental health system for a number of years.

¶ 41 The respondent testified that although his family lives in Detroit, California, and Iowa, he would not consider living with a family member and instead planned to move to Chicago if released. He stated that he had construction skills and planned to work in that field in Chicago. He also stated that he planned to live in a group home until he could find his own apartment. He did not offer any detail about his potential employment or housing. He did not indicate that he had researched any of these choices. Based on the respondent's demeanor, his numerous years in the mental health system, his lack of insight into his mental illness as evidenced by his and Dr. Vallabhaneni's testimony, Dr. Vallabhaneni's diagnosis of the respondent, and Dr. Vallabhaneni's opinion that the respondent would not take his medication if released, it was not against the manifest weight of the evidence for the jury to determine that the respondent was mentally ill and because of his mental illness he was unable to provide for his basic physical needs. Because there was sufficient evidence to sustain the jury's verdict based on the second ground presented to it, we cannot say that the result of the trial would have been different had the jury been properly instructed. Thus, the improper jury instructions given at the respondent's involuntary admission trial constituted harmless error.

¶ 42 Finally, the respondent argues that he was denied effective assistance of counsel. He argues that his counsel failed to object at trial that the jury instructions misstated the law and he failed to contradict the lack of evidence on his ability to take care of his basic needs. Section 3-805 provides that "[e]very respondent alleged to be subject to involuntary admission on an inpatient or outpatient basis shall be represented by counsel." 405 ILCS 5/3-805 (West 2010). "[T]he State's statutorily providing a respondent in an involuntary commitment proceeding with the right to counsel implicitly includes the right to the effective assistance of that counsel." *In re Carmody*, 274 Ill. App. 3d 46, 54, 653 N.E.2d 977, 983 (1995). The *Strickland* standard (*Strickland v. Washington*, 466 U.S. 668 (1984)) has been adopted in mental health cases involving involuntary commitment proceedings. *In re Mark P.*, 402 Ill. App. 3d 173, 179, 932 N.E.2d 481, 486 (2010). "Under *Strickland*, the respondent must establish that (1) counsel's performance was deficient, such that the errors were so serious that counsel was not functioning as the 'counsel' contemplated by the Code; and (2) counsel's errors were so prejudicial as to deprive [him] of a fair proceeding." *In re Carmody*, 274 Ill. App. 3d at 57, 653 N.E.2d at 985. To show prejudice, the respondent must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694.

¶ 43 As discussed, counsel's failure to object at trial to the jury instruction that misstated the law did not prejudice the respondent. We have established that counsel's failure to object to the misstatement of the law did not affect the outcome of the case because there was still one valid ground for the jury to find the respondent subject to involuntary commitment. Therefore, he suffered no prejudice because of the misstatement and has failed to establish the second prong of the *Strickland* test with respect to the jury instruction.

¶ 44     The respondent alleges that his counsel ignored the State's failure to provide any direct evidence on how his behavior satisfied the failure-to-meet-basic-needs criterion for commitment. He asserts that Dr. Vallabhaneni was the State's sole witness and that Dr. Vallabhaneni had not treated him for over six years; therefore, the State's case rested on historical facts and not his current behavior. The respondent argues that his counsel's lack of questioning on this matter prejudiced him. Because the respondent was intentionally uncooperative when Dr. Vallabhaneni tried to interview him, Dr. Vallabhaneni properly based his testimony on his meetings with the respondent, the respondent's clinical record, information from the respondent's treating psychiatrist, and the respondent's treatment plan review. This included both historical and current information on the respondent. The State did not fail to provide direct evidence of how the respondent would be unable to meet his basic needs if released from Chester Mental Health Center. Counsel's performance with respect to direct evidence presented by the State was not deficient and did not prejudice the respondent.

¶ 45     The respondent argues that he need not prove the *Strickland* element of prejudice because his counsel failed to subject the State's case to meaningful adversarial testing. Where counsel entirely fails to subject the State's case to meaningful adversarial testing, prejudice will be presumed. *People v. Hattery*, 109 Ill. 2d 449, 461-62, 488 N.E.2d 513, 517 (1985). Respondent's counsel did not fail to subject the State's case to meaningful adversarial testing. Counsel did not concede that the respondent was subject to involuntary commitment. Trial counsel moved for an independent evaluation of the respondent. He questioned prospective jurors to find out any potential biases and to ensure that the respondent would receive a fair trial. He exercised peremptory challenges to potential jurors. He gave an opening and closing statement. He conducted cross-examination of the State's witness, Dr. Vallabhaneni. Trial counsel conducted the direct examination of the respondent in which he tried to elicit testimony from the respondent to show that he was able to provide for his basic physical needs. After the respondent referred to some of his crimes, the State attempted to ask him questions about his criminal history. Counsel objected, and the objections were sustained. Because the respondent's trial counsel did subject the State's case to meaningful adversarial testing, the respondent needed to show prejudice to show his counsel was ineffective.

¶ 46     The trial court erred in giving the jury instructions that included unconstitutional and outdated criteria for involuntary commitment. However, one of the grounds presented to the jury for involuntary admission was valid. The respondent was not prejudiced by the erroneous jury instructions because the jury returned a general verdict and there was clear and convincing evidence presented to show that the respondent was unable to care for his basic needs if not subject to involuntary commitment. The respondent was not denied effective assistance of counsel. His counsel's failure to object to the erroneous jury instruction did not prejudice him. Because Dr. Vallabhaneni explained the basis of his testimony and it was based on the respondent's condition at the time of the hearing, counsel's failure to question him about whether it rested on historical facts and not his current state did not prejudice the respondent. Counsel did not fail to subject the State's case to meaningful adversarial testing.

¶ 47 CONCLUSION

¶ 48 For the foregoing reasons, the judgment of the circuit court of Randolph County is affirmed.

¶ 49 Affirmed.